860 P.2d 710 (1993)
Michael Ray HOGAN, Appellant,
v.
WARDEN, ELY STATE PRISON, Respondent.
No. 23193.
Supreme Court of Nevada.
September 29, 1993.
*712 Annette R. Quintana, Las Vegas, for appellant.
Frankie Sue Del Papa, Atty. Gen., Robert E. Wieland, Deputy Atty. Gen., Carson City, for respondent.

OPINION
STEFFEN, Justice.
This is the third time appellant Michael Ray Hogan has sought relief in this court from his first-degree murder conviction and sentence of death. The instant appeal is from the district court's order dismissing Hogan's post-conviction petition for a writ of habeas corpus. For reasons discussed hereafter, we conclude that Hogan's appeal is without merit and therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND
The details of Hogan's crimes are set forth in this court's opinion on direct appeal in Hogan v. State, 103 Nev. 21, 732 P.2d 422 (1987), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 153 (1987). Briefly stated, Hogan murdered his female companion, Heidi Hinkley, with a firearm and thereafter fired five bullets into the body of Heidi's young daughter who managed to survive and testify against Hogan. A jury convicted Hogan of first-degree murder and attempted murder, each with the use of a deadly weapon. After the penalty phase of the trial, the jury found Hogan deserving of death and he was sentenced accordingly. We affirmed Hogan's convictions and sentences on direct appeal, id., and later dismissed Hogan's appeal from the district court's denial of his petition for post-conviction relief based largely upon a claim of ineffective assistance of counsel.
The instant appeal challenges the district court's refusal to issue habeas relief. Hogan's petition for a writ of habeas corpus was rejected by the district court on grounds of procedural default or abuse of the writ and law of the case. For reasons discussed hereafter, we conclude that the district court was correct in its ruling and affirm.

DISCUSSION
Hogan first challenges the district court's determination that his petition for a writ of habeas corpus was a procedurally infirm abuse of the writ on grounds that neither of the two aggravating circumstances found by the jury were valid, and that he is therefore actually "innocent" of committing a capital crime.
Specifically, Hogan contends that a procedural bar to his petition for a writ of habeas corpus based upon an abuse of the writ does not exist where he is able to demonstrate that he is actually innocent of the aggravating circumstances used to qualify him for a capital sentence. Citing the recent United States Supreme Court case of Sawyer v. Whitley, ___ U.S. ___, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269, reh'g denied, ___ U.S. ___, 113 S.Ct. 21, 120 L.Ed.2d 948 (1992), Hogan stressed the Court's ruling that a petitioner may demonstrate "actual innocence" of the crime for which he was convicted or the penalty imposed if he shows "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."
Hogan assails the validity of the aggravating circumstance found by the jury relating to the commission of a prior felony "involving the use or threat of violence to the person of another." NRS 200.033(2). The primary thrust of Hogan's contention is that the Iowa manslaughter conviction was constitutionally infirm and that, in any event, the State did not prove that the Iowa felony involved the use or threat of violence to the person of the victim. Hogan seeks to support his claim of constitutional infirmity by referring to the stipulation of an Iowa assistant county attorney thirteen years after Hogan's guilty plea that the *713 plea was unconstitutional. The contention is unavailing. First, the Iowa district court denied Hogan's petition for a writ of habeas corpus on grounds that relief was barred by the running of the statutory period for an application for post-conviction relief. On appeal, the Iowa Supreme Court affirmed the ruling of the Iowa district court, stating:
[Hogan's] alleged "ground of fact or law" is that he was unaware, until his Nevada conviction for murder that his 1971 Iowa conviction for manslaughter would serve to severely enhance the penalty for a subsequent crime.... [I]t is an "obvious fact of life that most criminal convictions do in fact entail adverse collateral consequences." Sibron v. New York, 392 U.S. 40, 55 [88 S.Ct. 1889, 1899, 20 L.Ed.2d 917] (1968). Hogan's inability to accurately predict future events, and adjust his behavior accordingly, is not the sort of factual circumstance reasonably triggering the ground of fact exception of section 663A.3 ... We are persuaded that a reasonable interpretation of the statute compels the conclusion that the exonerating ground of fact must ... be "relevant and likely [to] change the result of the case." [Citation omitted.] Hogan's newfound insight clearly falls outside this category.
Hogan v. State, 454 N.W.2d 360, 361 (Iowa 1990) (emphasis added). It is thus clear that the Iowa Supreme Court found no factual basis for relieving Hogan of his felony conviction for manslaughter and there is no basis for presuming that the Iowa court ignored constitutional grounds for granting such relief.[1]
Hogan insists that irrespective of the constitutionality of his Iowa conviction, there was no evidentiary basis for finding that his crime involved the use or threat of violence on the person of his victim. Hogan is wrong. The record reflects that before the district court allowed evidence of the Iowa conviction to be introduced as an aggravating circumstance, the State provided the court with a transcript of the Iowa plea proceeding that conclusively demonstrated that Hogan resorted to violence in the commission of his crime. In the plea hearing before the Iowa district court on January 25, 1971, the following colloquy occurred, in pertinent part, between Mr. Dutton, the prosecutor, and Mr. Rothschild, attorney for the defendant, Hogan:
Mr. Dutton: I think perhaps the Court should be apprised of our reason for accepting that plea [manslaughter, where Hogan was charged with open murder]. As the Court was aware last week, the body was re-autopsied and it was determined at that time that the blow which the victim received on the top of the car during an altercation on the main street of Dunkerton was the cause of the fracture and the cause of death, and the facts leading up to that altercation and that blow are indicative of the crime of manslaughter as opposed to first or second degree murder, and it is our conclusion from reviewing the evidence in light of this new medical evidence that a plea to manslaughter is not only appropriate, but proper under the circumstances.
Mr. Rothschild: For the record, Your Honor, the Defendant now appears in person and by counsel and hereby enters a plea of guilty to the crime of manslaughter. I might say also to the statement of Mr. Dutton, when the Amended Minutes were filed Mr. Martin [defendant's co-counsel] and I checked out the theory of the fracture which resulted from the blow on the car as the cause of death. We checked with medical authority and came to the conclusion that, indeed, this was what happened and that this was the cause of death. Mr. Hogan *714 at this time still denies that he pushed this girl out of the car, but he does admit that he struck her head against the car, and on our advice he has entered a plea of guilty thereon.

(Emphasis added.)
As indicated above, the district court was provided with the referenced and quoted transcript of Hogan's plea hearing before the jury was allowed to consider Hogan's manslaughter conviction as an aggravating circumstance under NRS 200.033(2). The district court did not err in allowing the State to introduce evidence of the Iowa manslaughter conviction to the jury, and there was substantial evidence to support the finding by the jury that the State had proved the existence of this aggravating circumstance beyond a reasonable doubt.
The second aggravating circumstance found by the jury and challenged by Hogan is that "[t]he murder was committed by a person who knowingly created a great risk of death to more than one person by means of a weapon, device or course of action which would normally be hazardous to the lives of more than one person." NRS 200.033(3) (emphasis added). Hogan insists that the facts surrounding his crime demonstrate the invalidity of this aggravator. In support of the proposition, Hogan cites Jimenez v. State, 105 Nev. 337, 775 P.2d 694 (1989). Jimenez involved two victims, each of whom was stabbed to death by Jimenez with a different knife. There we held that the stabbings did not justify a finding that Jimenez knowingly created a great risk to more than one person by means of a weapon that would normally be hazardous to the lives of more than one person. Id. at 342, 775 P.2d at 697. We also stated:
Our cases reflect the view that the employment of a weapon, device or course of action that is intrinsically hazardous to more than one life is a necessary predicate to a finding under NRS 200.033(3). Thus, in Moran v. State, (citation omitted) we concluded that firing a gun in an apartment with only the victim present, and no other persons known by the perpetrator to be in close proximity to the crime scene, did not constitute an aggravating circumstance under NRS 200.033(3). However, we also held in Moran that firing a gun at the victim with another person nearby did satisfy the requirements of the statute.
Id. at 343, 775 P.2d at 697-98.
Moran alone would validate the finding of the NRS 200.033(3) aggravator in the instant case where Hogan knew, as he fired his gun at his murder victim, that the victim's teenage daughter was in close proximity to the crime scene. Perhaps more to the point, however, is the fact that Hogan engaged in a clear and deliberate course of conduct that created a hazard to more than one person. Indeed, this court so ruled in Hogan's direct appeal as we recognized that there was a divergence of authority on the point and then held "that the statute [NRS 200.033(3)] includes a `course of action' consisting of two intentional shootings closely related in time and place, particularly where the second attack may have been motivated by a desire to escape detection in the original shooting." Hogan, 103 Nev. at 24-25, 732 P.2d at 424.
In Commonwealth v. Stoyko, 504 Pa. 455, 475 A.2d 714 (1984), cert. denied, 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984), the court determined that the defendant had created great risk to the person of another by "repeatedly ramming [the victim's] car until it was forced off the highway, aiming a shotgun through the window of the car and firing three shots, all the while aware, by his own admission at trial, that there was an `other lady' in the car." Id., 475 A.2d at 721.
In the appendix to State v. English, 367 So.2d 815 (La.1979), the English court discusses a statutory aggravating circumstance similar to the one at issue here as follows:
The jury also found that the defendant knowingly created a risk of death or great bodily harm to more than one person. We agree that the evidence supports the theory that the defendant intended to commit each murder by a distinct act, that is, by shooting each intended *715 victim individually at short range. Arguably, the commission of any one of the individual murders would not have created the risk of death or great bodily harm to the other intended victims during the murder of the individual victim. This suggestion is supported by the fact that the killing of the victim did not cause injury or death to the other intended victims, both of whom escaped. Arguably, the legislature may have intended this aggravating circumstance to apply only to situations in which, for instance, the defendant sets a fire or explodes a bomb in an inhabited building, or shoots randomly into a crowd, where the same act which kills the victim also knowingly creates a risk of death or great bodily injury to more than one person. The more probable legislative intent is that the extreme penalty of death may be justified when the single consecutive course of conduct contemplates and causes the knowing creation of great risk of death or great bodily harm to more than one person, as here.

Id. at 824 (emphasis added). Accord State v. Williams, 480 So.2d 721, 726-27 (La.1985); State v. Glass, 455 So.2d 659 (La.1984), cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985), reh'g denied, 472 U.S. 1033, 105 S.Ct. 3516, 87 L.Ed.2d 645 (1985) (aggravator satisfied where defendant, by a single and consecutive course of conduct contemplates and causes great risk of harm to more than one person).
The Supreme Court of Florida, in Alvord v. State, 322 So.2d 533, 540 (Fla.1975), cert. denied, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976), held that three consecutive murders, each carried out by strangulation with the use of a rope, satisfied the aggravator of creating "great risk of serious bodily harm by death to other persons."
We cite the above case authorities in reaffirmation of our previous ruling on this issue in Hogan's direct appeal. It is of no consequence to multiple victims of a violent crime whether their deaths or injuries result from a weapon directed at each victim specifically or by random shootings or the use of a scattergun or other weapon of broader impact. Under the "course of action" aspect of NRS 200.033(3), the statute is satisfied if the perpetrator knowingly creates a great risk of death to more than one person by embarking upon a course of conduct that would normally be hazardous to the lives of more than one person. Obviously, one who intends to commit multiple murders within a closely related time and place engages in a course of conduct inherently hazardous to the life of more than one person. As we held in the opinion generated from Hogan's direct appeal, there was no error in finding that Hogan had engaged in criminal conduct falling within the purview of the aggravating circumstance defined by NRS 200.033(3).
The distillate of the foregoing analysis is that this court, on direct appeal, thoroughly considered and ruled valid the two aggravating circumstances found by the jury in qualifying Hogan for the penalty of death. That ruling is now the law of the case. See Hall v. State, 91 Nev. 314, 535 P.2d 797 (1975). The instant appeal merely supplies a more focused review of the issues stemming from the illumination of hindsight. As we stated in Hall, however, the "doctrine of the law of the case cannot be avoided by a more detailed and precisely focused argument subsequently made after reflection upon the previous proceedings." Id. at 316, 535 P.2d at 798-99.
Moreover, Hogan has failed to demonstrate a basis for habeas relief under the exceptional provisions of NRS 34.810. Specifically, Hogan has not shown good cause for again seeking relief on the theory that the two aggravating circumstances were invalid. Despite Hogan's attempt to cast his theories in a new factual and legal light, his efforts have revealed no justification for overcoming the procedural bar of NRS 34.810. Absent entirely is a basis for a finding of good cause attributable to a "fundamental miscarriage of justice ... result[ing] from a failure to entertain the claim." McCleskey v. Zant, 499 U.S. 467, ___, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). Equally apparent from the record *716 is Hogan's failure to forward a "colorable showing of factual innocence" that would justify elevating concerns of fundamental justice over the need to demonstrate good cause in entertaining a repetitive claim for relief. Id.
Additionally, Hogan has failed to show that he has sustained actual prejudice by any alleged constitutional error in the trial court or on appeal. Hogan's burden of demonstrating "not merely that the errors of trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, in affecting the state proceeding with error of constitutional dimensions" has not been met. United States v. Frady, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982). Indeed, as we have previously held, the threshold burden of proving that the aggravating circumstances were infected with constitutional error has not been satisfied. Accordingly, there is no basis for a claim of prejudice.
The district court correctly discerned that Hogan's habeas petition constituted an abuse of the writ. Hogan has simply failed to meet his burden of proving "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." Sawyer, ___ U.S. at ___, 112 S.Ct. at 2517.
Hogan's attempt to revisit the issue of ineffective assistance of counsel at the trial and appellate levels must also fail. We have previously determined, and it is now the law of the case, that Hogan's trial and appellate counsel were clearly effective and that the criteria for relief established by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), have not been satisfied. The primary gravamen of Hogan's ineffective assistance of counsel claim relates to what he considers the failure to investigate the constitutional validity of his Iowa conviction. We have revisited the Iowa conviction in the instant case and have concluded from the evidence of record that any additional investigation of the circumstances of that conviction by defense counsel would have been unavailing. Hogan's contention is without merit.
We have carefully reviewed the other issues raised by Hogan and conclude that they are without merit and that, given our disposition of this appeal, they need not be addressed.

CONCLUSION
For the reasons discussed above, the district court's order dismissing Hogan's petition for a writ of habeas corpus (post-conviction) is affirmed.
ROSE, C.J., and YOUNG and SHEARING, JJ., concur.
SPRINGER, Justice, dissenting:
In my dissenting opinion to Canape v. State, 109 Nev. ___, 859 P.2d 1023 (1993), I expressed the view that a convicted first degree murderer becomes "death-eligible" at such time as a sentencer concludes, beyond a reasonable doubt, that there is at least one aggravating circumstance associated with the murder and that mitigating circumstances do not outweigh aggravating circumstances. The principal issue in this appeal is whether Hogan is death eligible by reason of at least one aggravating circumstance's having been proven beyond a reasonable doubt. The two aggravating circumstances which the State relies on are that Hogan had been previously convicted of a felony involving the use of violence and that his crime created a great risk of death to more than one person. Neither aggravating circumstance has been proved beyond a reasonable doubt.

Previous Conviction
Hogan pleaded guilty to manslaughter in Iowa in 1971. At the time of his manslaughter conviction, Iowa's definition of the crime did not include a breakdown into the two forms of Common Law manslaughter: Voluntary Manslaughter and Involuntary Manslaughter. At Common Law, Voluntary Manslaughter entailed the intentional killing of a human being in the heat *717 of passion. Involuntary manslaughter was an unintentional killing. A certified copy of Hogan's 1971 Iowa "manslaughter" conviction does not tell the sentencer whether Hogan had intentionally or accidentally killed someone.
The record of this case reveals certain circumstances surrounding Hogan's manslaughter guilty plea and conviction that were not made known to the sentencing jury. We know, for example, that Hogan's guilty plea to "manslaughter" was accepted and that the conviction was entered in a manner that was violative of the United States Constitution. We also know that the State of Iowa stipulates[1] to the unconstitutionality of the voluntary/involuntary manslaughter conviction.
If I am wrong in saying that Iowa's stipulation that Hogan's conviction is invalid should be conclusive on the point, then surely I am not wrong in saying that Hogan ought, at least, to have the right to have this issue adjudicated by the Nevada courts. It is not easy to predict how Nevada would be able to establish that Hogan's conviction is valid, when Iowa, the venue of the conviction, says that it is not valid; still, it seems to me that, at the very least, the prosecution in Nevada has the burden to prove beyond a reasonable doubt that the Iowa manslaughter conviction is not constitutionally objectionable.
To go on, even if the prosecuting attorneys in this case can in some manner show that the Iowa manslaughter conviction is valid and should be recognized by this state, the next question that presents itself is, "Conviction of whatintentional homicide or accidental homicide, voluntary manslaughter or involuntary manslaughter?" There is no way of knowing, at least from the authenticated copy of the judgment of conviction upon which the present prosecution relied, whether the conviction was for an intentional or unintentional homicide.[2]
The Nevada prosecuting attorney in this case, in proving this aggravating circumstance, simply relied on the Iowa record. As the prosecutor put it to the jury, "Now, you haven't learned anything about the circumstances of that event, but you know a woman died.... Ladies and Gentlemen, the documentary evidence is before you. State's Exhibits 100 and 101" (the authenticated copies of the Iowa conviction for "manslaughter"). I do not see how the mere introduction of this "documentary evidence" establishes beyond a reasonable doubt that Hogan is guilty of an intentional *718 homicide.[3] The authenticated copy of an Iowa "manslaughter" conviction, even a valid conviction, simply will not suffice to support a jury conclusion that Hogan was convicted of a felony that involved the use of violence.
The only aggravating circumstance that can possibly support a finding of death eligibility in this case is that Hogan created a "great risk" to the lives of others. Hogan deliberately killed one person and then deliberately tried to kill another. I suppose one could say that immediately before Hogan pulled the trigger, his victims were, in a manner of speaking, "at risk." I do not believe that two, independent, deliberate consecutive killings comprise the kind of knowing creation of a "great risk of death to more than one person" that was contemplated by NRS 200.033(3). The gist of my position is that the isolated stabbing or shooting of a person, intentionally and deliberately, cannot constitute the required, conscious knowing that some person other than the immediate murder victim is at "great risk" unless other persons are in the immediate "zone of danger," and the murderer knows at the time of the murder that he or she is placing others at great risk.[4]

Knowingly Creating a Great Risk of Death of More Than One Person
The first point that I want to make is that this knowledge-of-the-risk aggravator above all requires knowledge on the part of the murdererthe murderer must know, must be aware, that at the time he is killing his victim, he is also, at the same time, placing some other person at great risk of death. It is the murderer's indifference to the life of others that provides the *719 rationale for this aggravating circumstance. If, for example, the murderer kills with a firearm, knowing that there is some one else in the line of fire or close to it, then the murderer may well be said to have murdered at a time when he was knowingly creating a great risk of death to another person.[5]
What I am saying about the nature of this aggravator is exampled in our Jimenez case, cited in the Majority. 105 Nev. 337, 775 P.2d 694 (1989). In Jimenez, as here, there were consecutive, homicidal events. In Jimenez, however, we held that consecutive stabbings did not fulfill the requirements of this aggravator, noting that, "Jimenez, if acting alone, would have had to stab one victim and then turn his attention to stabbing another." Id. at 342, 775 P.2d at 697. In the case now before us, Hogan "had to [shoot] one victim and then turn his attention to [shooting] another." "[T]he employment of a weapon, device or course of action that is intrinsically hazardous to more than one life is a necessary predicate to a finding under NRS 200.033(3)." Id. at 342, 775 P.2d at 697. Neither consecutive, intentional stabbings nor consecutive, intentional shootings are "intrinsically dangerous to more than one person."[6] The "necessary predicate" is not present in Hogan's case.
Although I am not sure, it seems that the Majority is saying that killing one person and then trying to kill another is a "course of conduct" that is, to use the language in Jimenez, "intrinsically hazardous." At the time Hogan shot and killed his woman friend, the second victim was not present, and Hogan could not possibly have been "knowingly," creating any hazard to her. At the time Hogan murdered, he was not doing something that was "intrinsically hazardous" or that "would normally be hazardous" to others. For the aggravator to relate to Hogan, Hogan must have known that in the act of shooting his woman friend, his actions were "normally" or "intrinsically"[7] dangerous to the second victim. Hogan, very simply, cannot be said to have known at the time he shot his woman friend that he was, by shooting her, creating a "great risk of death" to another person whose whereabouts was not even known to him at the time.
The Majority gives us a very good example of "intrinsically hazardous" conduct when it cites the Stoyko case. In Stoyko, the murderer rammed a car occupied by the victim and others and then, knowing that there were persons other than the victim in the car, discharged a shotgun into the interior of the cara perfect example of knowingly creating a great risk of death to more than one person. Com. v. Stoyko, 504 Pa. 455, 475 A.2d 714 (1984). Such conduct is intrinsically hazardous, because it is by its very nature dangerous to others. If, for example, Hogan had shot at his murder victim at the time when his victim's daughter was in the line of fire or *720 at least in the same room, a case might be made for knowingly creating a great risk if it could be shown that Hogan had known of the other's presence and had acted heedlessly. This is not the case here, however. There is nothing intrinsically or essentially dangerous to more than one person that characterizes Hogan's shooting one and, later, another person.[8]
The legislature could, of course, widen the aggravating circumstance noose by creating a new and different aggravator that made successive killings of two or more people within a certain interval of time constitute an aggravating circumstance. See note 6 supra. As the law now stands, however, under NRS 200.033(3), killing one person and later killing or trying to kill another is not an aggravated murder.
We must remember that the essence of all of these aggravating circumstances is increased culpability. A person who in the process of committing a murder shows an utter disregard of human life, and "knowingly creat[es] a great risk of death" to persons other than his immediate victim, is certainly more culpable than a person who kills one person and then, subsequently, tries to kill another. This kind of culpability is not present in Hogan's case. Hogan cannot be executed on the basis of this statutory aggravating circumstance.

Law of the Case
All I have to say on this point is that if neither aggravating circumstance can possibly exist under the facts of this case, then past adjudications by this or by other courts, whether right or wrong at the time, should not be permitted to be the direct and proximate cause of this man's execution.
NOTES
[1] In this court's opinion resulting from Hogan's direct appeal, we considered and rejected Hogan's contention that his guilty plea to felony manslaughter in the Iowa district court was constitutionally infirm. Notwithstanding the highly belated "stipulation" of the Iowa assistant county attorney to the contrary, we expressly held, after reviewing the transcript of the Iowa plea canvass, that "each of the rights enumerated in Boykin [Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) ] was waived...." Hogan, 103 Nev. at 24, 732 P.2d at 424, n. 1.
[1] Iowa stipulates that Hogan's plea to "manslaughter" violated Iowa law because of the lack of adequate assistance of counsel and because of a violation of the Boykin requirements applicable to the pleas. See State v. Sisco, 169 N.W.2d 542 (Iowa 1969) (Iowa's adoption of the Boykin rules). The Majority appears to be saying that it is not enough for the State of Iowa to admit that the conviction is infirm; the Majority insists on an adjudication of the conviction's invalidity and appears to be saying that because Hogan did not timely raise the issue in the Iowa courts, he will not be permitted to raise the unconstitutionality of his conviction as he now attempts to save his life.
[2] At the penalty stage hearing, the Nevada prosecution introduced an authenticated copy of an Iowa conviction for manslaughter. The problem is that in 1971 the Iowa manslaughter statute did not distinguish between voluntary and involuntary manslaughter, between violent and nonviolent manslaughter. In 1971, manslaughter was defined in the Iowa criminal code, Section 690.10, as follows: "Any person guilty of the crime of manslaughter shall be imprisoned in the penitentiary not exceeding eight years, and fined not exceeding one thousand dollars." The statute did not distinguish between voluntary manslaughter, which is an intentional, "violent" killing, and involuntary manslaughter, which in Iowa might have been a homicide in which a person "by accident kills another." See State v. Abarr, 39 Iowa 185 (1874). Voluntary manslaughter did not become a statutory crime until 1981, after Hogan's conviction. Section 707.4 of the Iowa criminal code now defines "voluntary manslaughter" in common law terms and provides that this crime is committed "under circumstances which would otherwise be murder," and goes on to mitigate the crime in cases of "irresistible passion" and "serious provocation." "Voluntary manslaughter" is not the crime relied on as an aggravator in this case. In 1971, when Hogan entered his constitutionally objectionable guilty plea to "manslaughter," the statute did not, as said, divide the crime into voluntary and involuntary manslaughter. In 1971, "manslaughter" was a crime that might or might not have involved the intentional killing by the use of force or violence.
[3] The Majority puts great stock in statements made by Hogan's attorney in proceedings held in Iowa in January 1971. The Iowa homicide involved a motor vehicle. Hogan's attorney speculated on his "theory of the fracture which resulted from the blow on the car [sic] as the cause of death." Hogan's attorney expressed his opinion that "this [`blow on the car'] was the cause of the death." The attorney, not Hogan, commented that Hogan "struck her head against the car, and on our advice he has entered a plea of guilty thereon." I probably should not quibble about the meaning of the statement by Hogan's lawyer that Hogan, whether accidentally or intentionally, "struck her head against the car," because this dialogue with the Iowa court was not part of the death penalty hearing in this case; but it seems to me that even if this statement had been introduced into the Nevada proceedings, it is subject to contradiction and explanation. The bald fact that Hogan "struck her head against the car" does not, of itself, clarify the application of the undifferentiated Iowa "manslaughter" statute and does not establish beyond a reasonable doubt that Hogan committed the crime of voluntary manslaughter. This is particularly true because there is no mention of the essential elements of a voluntary manslaughter conviction, adequate provocation and killing in the heat of passion. Even if the Nevada courts were to accept the Iowa manslaughter conviction, Hogan ought to have an opportunity to show, if that is his position, that his manslaughter conviction was not for voluntary manslaughter but, rather, for an unintentional killing and that unintentional, accidental homicide is not the type of felony contemplated by our "use of violence" aggravator. As matters now stand, even if we were to accept the "manslaughter" conviction as being constitutionally acceptable, the question of whether Hogan's Iowa conviction was for voluntary or involuntary manslaughter is necessarily a matter of conjecture and not the type of evidence upon which a death penalty judgment can be properly based.
[4] In Hogan v. State, 103 Nev. 21, 23, 732 P.2d 422 (1987) ("Hogan I"), we incorrectly held that two, consecutive "intentional" shootings, closely related in time and place, could fulfill the requirements of NRS 200.033(3), because consecutive murder constituted a "course of conduct" that created a great risk of death to more than one person. I now understand (as I should have when I signed Hogan I) that when a murderer shoots and kills one person and then goes on later to shoot a second person, the murderer cannot be guilty of the knowledge-of-risk aggravator unless, at the time he shoots the first person, he knows that by his action in shooting the first person, he is, at the same time, creating some risk of death to the second person. This court recognized this rather obvious reality when it decided Jimenez v. State, 105 Nev. 337, 775 P.2d 694 (1989). The only difference between the case currently before the court and Jimenez is that Jimenez involves consecutive stabbings, whereas, the present case involves consecutive shootings. The Majority opinion and Jimenez are irreconcilable. Jimenez overruled Hogan I insofar as Hogan I might have stood for the proposition that a first shooting necessarily involves knowing risk exposure to a second victim, even if the consecutive shootings are "closely related in time and place," (unless, of course, the murderer knows that when he shoots the first victim, he is putting victim number two at "great risk of death").
[5] I would comment here that in the stated example the person who was intentionally killed was not really at any riskcertainly not at risk in the mind of the murderer who killed intentionally and not through any risk-taking activity. A more carefully worded statute would read, "knowingly creating great risk of death to any person other than the victim of the murder being charged."
[6] The legislature might, in the future, try to construct some other form of aggravating circumstance that would be comprised of serial or consecutive killings or attempted killings and probably would not involve the mental element of "knowingly" creating risk. It would be difficult in drafting such a statute to define just how many consecutive killings would have to take place and during what specified duration of time they must be perpetrated.
[7] I may be belaboring this point, because, it is so clear that Hogan could not possibly have known of any danger to his woman friend's daughter at the time of the first shooting because, at that time, the daughter was not in danger. Unless the person-at-risk is in a "zone of danger" of which the convicted murderer was aware, this aggravator cannot be present. Some things are intrinsically dangerous, such as a bomb. A "course of conduct" might be intrinsically hazardous, such as firing an automatic weapon into a crowd at a football game. Such acts are intrinsically dangerous to persons other than the intended victim because by their nature they are dangerous to others. If a person were to decide to kill another by burning down a motel, such an act would be "intrinsically hazardous" to more than one person. An isolated shooting or stabbing cannot possibly be called "intrinsically hazardous to more than one life."
[8] The English case, cited in the Majority opinion, mistakenly invokes this risk-based aggravator in a non-risk case. Note that in English, the court acknowledged that "the defendant intended to commit each murder by a distinct act, that is, by shooting each intended victim individually at short range." State v. English, 367 So.2d 815, 824 (La.1979) (emphasis added). Such circumstances might fulfill the requirements of some hypothetical, "multiple murder" aggravator, but it certainly cannot be the predicate for a knowing, great-risk-of-death-to-more-than-one-person aggravator, because, definitionally, "knowing" or subjective risk-taking is inconsistent with the doing of intentional harm. When I intend to harm someone, it is idle to say that I am creating a "risk" of harm to that person.